**SO ORDERED.**

**SIGNED this 02 day of March, 2011.**



_____
**ROBERT E. NUGENT**
**UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: ) | |
| ) | |
| NORDYKE VENTURES, LLC, ) | Case No. 10-13332 |
| ) | Chapter 11 |
| Debtor(s). ) | |

### MEMORANDUM OPINION

Creditor Benton Holdings, L.L.C. ("Benton") seeks orders granting stay relief and dismissing this case. Both motions are founded on Benton's contention that this case is a serial filing done to attack the debtor's previously confirmed plan and to evade the consequences of pending state court litigation. The parties appeared for an evidentiary hearing on the stay relief motion on November 18, 2010. At that time, the Court admitted a series of exhibits by stipulation. The parties also stipulated that, for the purposes of this hearing, the allegations made in the debtor's adversary

-1-

complaint filed in Adv. No. 10-5253 would be taken as true.[1] After hearing oral argument, the Court took the matter under advisement. Subsequently, the parties agreed that as the facts underlying Benton's Motion for Stay Relief also control its Motion to Dismiss the case, the Court would consider both motions based on the evidentiary record from the November hearing. After considering the evidence and arguments of counsel, the Court is prepared to rule on both matters at this time.

Findings of Fact

Nordyke Ventures, L.L.C. ("NV") is a Kansas limited liability company whose sole member is Mark Nordyke. NV owned investment or development real estate and leased cell towers in Sedgwick and Reno Counties. In 2007, NV filed a chapter 11 case in this division and, in 2008, the court confirmed NV's chapter 11 plan.[2] In the course of that case, Benton acquired the claim of Sunflower Bank. Sunflower's claim was secured by mortgages on residential rental real estate and assignments of rents on those properties. NV also owned a shopping center in west Wichita that was encumbered by a lien in favor of Community National Bank. NV also owned cell tower land leases that were encumbered by assignments of rents to Wireless Capital Partner, LLC. Neither the shopping center nor the cell towers secured Sunflower's claim. As will be detailed below, during the 2007 case, Sunflower sold its claim to Benton who then, by means of a court-approved cash collateral order, obtained further security interests in the non-residential property and the cell-

---

[1] Ex. 31 - *Nordyke Ventures, L.L.C. v. Benton Holdings, L.L.C.*, Adv. No. 10-5253, Dkt. 1, filed November 11, 2010.

[2] The Hon. Dale L. Somers, U.S. Bankruptcy Judge, was assigned to hear the first chapter 11 case, *In re Nordyke Ventures, LLC,* Case No. 07-11491 filed June 26, 2007. An Order confirming the chapter 11 plan was entered July 1, 2008, Dkt. 212. Mark Lazzo, Esq. represented NV in the first case.

-2-

towers. The cash collateral order then became the basis for the treatment of Benton's claims in the plan that was confirmed. NV failed to make the necessary payments to Benton and Benton enforced its rights under the plan, which triggered NV's filing of the present case to seek an "interpretation" by this Court of the 2008 plan and confirmation order. This much would be easy to ascertain from a review of the papers filed in this and the 2007 case.

NV also asserts that it has been the victim of a series of "secret agreements" between Benton and an entity called HGMJ that were not disclosed in the 2008 disclosure statement or plan and that were never disclosed to or approved by the court. After filing this case on September 28, 2010, NV commenced Adv. No. 10-5253 on November 11, 2010, demanding a variety of remedies against Benton on account of these secret agreements. This Court must determine whether these facts and circumstances warrant permitting NV to proceed with its second chapter 11 case in the past three years and to pursue the adversary relief. The sequence of events is as follows.

Sunflower loaned NV approximately $3 million against nineteen separate parcels of real property in Wichita. Neither the shopping center nor the cell tower leases were included as security for these loans. When these loans matured, Sunflower foreclosed in Sedgwick County District Court, (Case No. 06-CV-4447), and obtained a judgment against NV and Nordyke in the amount of $1.616 million plus interest and fees. This judgment imposed a judgment lien on the shopping center, but not on the cell tower leases or NV's Reno county land.[3]

NV filed its first chapter 11, Case No. 07-11491 on June 26, 2007. In July of 2007, Sunflower Bank and the debtor agreed to a cash collateral order that allowed NV to use the rents

---

[3] KAN. STAT. ANN. § 60-2202(a) (2005) makes a judgment a lien on any real property owned by the judgment debtor in the county where the judgment is entered.

from its various real estate holdings and granted a security interest in the future rents of these properties to the Bank as adequate protection.[4] This order did not grant a security interest in either the shopping center or the cell tower leases to the Bank.

Prior to March 4, 2008, NV and Benton made an unwritten agreement that Benton would acquire Sunflower's claim at a discount. Because Benton believed that Sunflower was undersecured, NV would be required to grant Benton additional security. This additional "security" included (a) a warranty deed on all the mortgaged property; (b) a warranty deed to the shopping center; and (c) an assignment of all the cell tower leases. In turn, Benton would grant some third-party entity to be named by NV an option to repurchase this property for an amount equal to what Benton paid to acquire the Sunflower claim plus any expenses Benton incurred, including its attorneys fees. In addition, Benton would collect a flat 23.6 percent fee on whatever amounts Benton paid to buy the claim, pay property taxes, attorneys' fees, and other related expenses. Also, Benton would advance funds to NV to pay NV's bankruptcy counsel's attorney's fees. With this understanding, Benton acquired Sunflower's claim on March 4, 2008.[5]

On March 17, 2008, Benton memorialized this agreement when it signed an Escrow Agreement with HGMJ Properties, LLC, a Kansas limited liability company whose members were Mark Nordyke and his father, Howard.[6] Neither NV nor Mark Nordyke signed this agreement in an individual capacity. The elder Nordyke had no role in the management or operations of this company. Under this agreement, Benton was the seller and HGMJ the buyer of all the deeded and

---

[4] Ex. 7.

[5] Ex. 11.

[6] Ex. 19.

assigned property, subject to the following terms. HGMJ was to purchase the "Primary Property" and NV and Nordyke were to convey to Benton the "Secondary Property." Nowhere in the agreement are these capitalized terms defined. The Court suspects that the "primary" property was the property subject to the Sunflower mortgages and that the "secondary" property referred to the added security, the shopping center and the cell tower leases. According to the Escrow Agreement, the purpose of the transfers of the secondary property was to secure Benton's "unsecured" claim. Benton then agreed to sell all of this property to HGMJ for a price that was defined as the cost Benton incurred in acquiring the claim plus any fees or taxes it paid while in control of the property, all of the attorneys fees for both Benton and HGMJ (and NV) plus a "fee" of 23.67% of the sum of the forgoing. This amount was payable to Benton in monthly payments amortized at 9 per cent interest over an undefined term and a balloon payment due on April 20, 2009. The price also included "Borrowed Funds," defined as funds borrowed by Benton to buy the Sunflower claim or maintain the properties, which were to be repaid to Benton at whatever interest rate Benton's lender charged plus a 3 percentage point kicker. Benton would remain in control of all of the property, collecting the rents and managing it, while HGMJ would have the right to sell tracts during the term of the Escrow Agreement.

      As security for the purchase price, NV was to execute deeds to the real estate (including the Reno County real estate which was not included in Sunflower/Benton's collateral) and assignments of the tower leases to Benton. Except for the shopping center deed and the cell tower lease assignments, these deeds could be recorded by Benton. Along with those deeds were deeds and assignments from Benton to HGMJ of the same land. The Benton-HGMJ deeds were held in escrow by NV's bankruptcy counsel, Mark J. Lazzo, Esq. If HGMJ defaulted on the terms of the agreement,

Benton could record the shopping center deed and cell tower lease assignments. If HGMJ paid the purchase price in full, Lazzo was to deliver the deeds to HGMJ.

Mark Nordyke signed this agreement in his representative capacity for HGMJ. The Escrow Agreement was never disclosed to the bankruptcy court, nor was it discussed or disclosed in either NV's plan or disclosure statement. Instead, on March 26, 2008, NV filed a motion to order Benton to turnover the rents and for cash collateral usage that proposed only that Benton receive a post-petition lien on rents and did not mention the escrow agreement.[7] Two days later on March 28, NV filed its plan and disclosure statement. NV proposed to treat Benton's secured claim by selling the properties and paying Benton the proceeds.[8] Benton took over the all of the properties on March 31. On the same day, the March 26 motion was heard on an expedited basis and the Court announced that the matter would be resolved by a journal entry to be submitted by the parties. On April 3, 2008, NV and Benton submitted an agreed new cash collateral order that provided for Benton managing the real estate and collecting the rents.[9] Benton was authorized to pay expenses and an adequate protection payment from the rents. As further adequate protection, the Court granted Benton a post-petition lien on all rents and a new security interest in the cell towers. The debtor was authorized to deliver all documents Benton deemed necessary to protect its position. NV's plan incorporated the terms of the cash collateral order by reference and stated that Benton's claim was secured by various liens in the cell tower leases along with its other security interests. The April 3, 2008 cash collateral became final on April 25, 2008 when the court entered an order

---

[7] Ex. 12.

[8] Ex. 16.

[9] Ex. 13.

titled "Order Authorizing Pre-petition Debts."[10] That order made no mention of any pre-petition debts; rather, by its terms, it made the April 3 cash collateral arrangement final. NV's plan was confirmed on July 1, 2008.[11]

On May 27, 2008, NV executed a security agreement granting Benton a security interest in all rents and profits generated by the properties identified in the Sunflower Bank foreclosure decree and rents from the shopping center and the cell tower leases to secure all liabilities of NV to Benton then owed or thereafter to be incurred.[12] After the plan was confirmed on July 1, NV and Benton entered into an Addendum to the Escrow Agreement that essentially removed the name of HGMJ from the agreement and replaced it with NV's name, imposing upon NV all of the rights and duties that had formerly been HGMJ's.[13] Nordyke signed the addendum as a representative of HGMJ. Again, NV was not a signatory even though the Addendum delegated various duties to it, including the obligation to pay Benton over a million dollars. In addition, Benton agreed to loan NV money to pay Lazzo's outstanding fees in the chapter 11 case. This not disclosed by Lazzo in any of his fee application filings.

Neither NV nor HGMJ performed under the Escrow Agreement and Addendum and on May 28, 2009, Benton demanded that Lazzo deliver the deeds in escrow to Benton.[14] Lazzo turned over the deeds to the shopping center and the assignments of the cell tower leases. Benton recorded the

---

[10] Ex. 15.

[11] Ex. 21.

[12] Ex. 18.

[13] Ex. 20.

[14] Under the Escrow Agreement and Addendum, the purchase price to be paid Benton was due April 20, 2009.

-7-

shopping center deed on June 1, 2009. The legal descriptions on that deed were added by interlineation. On June 8, 2009, Benton demanded that the lessees of the cell towers pay rent to Benton and not NV. On January 6, 2010, Benton sued NV and the lessees in Sedgwick County District Court, Case No. 10-CV-52, for possession of the rents and to foreclose its security interest in the towers.[15]

During 2009, Mark Nordyke commenced several pro se lawsuits against Benton in Sedgwick County District Court. In the petition he filed in Case No. 09-LM-13377 to "replevin" the cell tower leases and the shopping center, Nordyke referred to the Escrow Agreement and Addendum, stating that "he entered into" them.[16] He made a similar admission in Case No. 09-CV-4925 in which he sued Benton, Brenton DuPont who is Benton's principal member, and DuPont Property Management, Benton's managing agent, for fraud and breach of the escrow agreement and addendum.[17] Both these cases were dismissed before the present bankruptcy case was filed.

On September 28, 2010, NV filed the current chapter 11 case, halting a bench trial scheduled in Benton's foreclosure case, Case No. 10-CV-52, for September 29, 2010.[18] On October 8, 2010, Benton filed its motions to dismiss NV's bankruptcy case and for relief from the automatic stay to proceed forward with its state court case, contending that NV did not file this chapter 11 case in good faith and that this is cause for terminating the stay under § 362(d)(1) and for dismissal under

---

[15] Ex. 23.

[16] Ex. 24.

[17] Ex. 25.

[18] Ex. 23. The final pretrial order was entered in the state court case on September 20, 2010.

-8-

§ 1112(b).[19]

Analysis

The principal issue on Benton's stay relief and dismissal motions is whether NV filed the 2010 case in good faith. The Bankruptcy Code does not expressly prohibit the filing of serial chapter 11 cases. As the Supreme Court held in *Johnson v. Home State Bank*, had Congress intended to outlaw successive chapter 11 filings, it would have included that prohibition in § 109 where it explicitly conditioned or prohibited successive chapter 7 and 13 filings.[20] Still, many courts have held that a reorganized debtor may only file a subsequent case in certain circumstances. As stated in *In re Adams*:

> Courts agree that the general rule is that a reorganized debtor may not file a new plan to effect a modification of its substantially consummated plan. The terms of a confirmed plan are binding on the parties and should be given *res judicata* effect. The terms of a confirmed plan usually represent the results of negotiations between the debtor and its creditors, and the parties should be able to rely on the finality of those terms.[21]

Because § 1127 prohibits a reorganized debtor from modifying its plan once that plan has been substantially consummated, many courts conclude that permitting that debtor to accomplish the same end via a new filing would circumvent that section's clear prohibition. Moreover, as these courts point out, permitting a debtor to make a serial filing allows it to evade binding responsibilities it incurred in proposing and confirming the previous plan. Because the creditors have acted in reliance on the earlier plan, it should not be subject to further modification.[22] Only where there has been a

---

[19] Dkt. 24 and 26.

[20] 501 U.S. 78, 87, 111 S.Ct. 2150, 115 L.Ed. 2d 66 (1991).

[21] *In re Adams*, 218 B.R. 597, 600 (Bankr. D. Kan. 1998).

[22] *Id.* at 600-01.

showing of "genuine need" for further reorganization that is established by an extraordinary change of circumstances that were unanticipated and not reasonably foreseeable at the time of the first plan, should a debtor be given a second opportunity to reorganize.[23] Even so, extraordinary circumstances will not support a new case where the changes do not substantially impair the debtor's performance under the confirmed plan.[24]

Many courts have applied rules similar to those found in *Adams*.[25] Judge Norton's treatise notes that there are several other judicially-recognized "exceptions" to the case law ban on serial chapter 11 filings.[26] If the reorganized debtor proposes to liquidate in the later case, dismissal is not always indicated, although, as Norton notes, conversion to chapter 7 may well be in order. If the reorganized debtor is a "large debtor" with many employees, some courts permit a serial filing. Cases filed as "small business" cases after the effective date of BAPCPA may be refiled, but are subject to severe limitations on the continuation of the stay in the later case by § 362(n).[27]

NV primarily relies on the "liquidation" exception. In NV's argument and papers, it claims that its intent in filing the present case is two-fold: (1) to void the "secret agreement;" and (2) to file

---

[23] *Id.* at 601-02.

[24] *Id.* at 602.

[25] *See, e.g.*, *In re Tillotson,* 266 B.R. 565, 569 (Bankr. W.D.N.Y. 2001) (granting motion to dismiss serial filing unless debtor files plan that is "fundamentally fair" in 20 days).

[26] Hon. William L. Norton, Jr. and William L. Norton III, 6 NORTON BANKR. L. & PRAC. §111:4 (3d ed. Thomson/West 2008).

[27] The first NV case was filed as a "small business" case, but likely was not eligible for that designation because § 101(51D) excludes from the definition of a small business debtor one whose "primary activity is the business of owning or operating real property or activities incidental thereto." Nordyke Ventures was, and remains to this day, focused entirely on that pursuit. Indeed, in this second NV case, NV amended its petition to remove the small business designation. *See* Dkt. 77.

-10-

a liquidating plan. The debtor has filed an adversary proceeding seeking several remedies including avoiding various fraudulent conveyances, rescission of Benton's liens, the subordination of Benton's claims, and for a declaration of what is owed to Benton.[28] As yet, the debtor has filed no plan. In defense of the present motions, the debtor essentially relies on the *Jartran* case as the basis for remaining in chapter 11.[29] In that case, the Seventh Circuit affirmed a bankruptcy court's holding that a serial chapter 11 filing by a failed reorganized debtor, done for the expressed purpose of liquidating the reorganized entity's assets and done in the absence of bad faith, was not an improper modification of the first plan.[30] NV claims that it finds itself in the same position.

For the purpose of this discussion, the Court will take debtor at its word that a liquidation plan is forthcoming. But that alone does not dispose of the question because, as the Seventh Circuit and other courts have held, the filing must be done in good faith. The circumstances leading up to the confirmation of NV's previous plan and the filing of this case cut against a finding of good faith. Under the first plan, NV was to have completed payments on the short-term "repurchase" of its assets as set out in the "secret" Escrow Agreement and the cash collateral order incorporated by reference into the plan. The debtor plainly failed to do that, warranting a declaration of default under the agreement and the plan. Nominally none of these assets remain in the estate. All that this estate contains are the debtor's claims to recover those assets via the adversary proceeding.

In its argument and brief, NV insists that only this Court is in a position to avoid the secret Escrow Agreement and Addendum and to "interpret" the confirmed plan. The debtor argues that

---

[28] Ex. 31, Complaint in *Nordyke Ventures LLC v. Benton Holdings, LLC,* Adv. No. 10-5253 (Bankr. D. Kan.).

[29] *In re Jartran, Inc.,* 886 F.2d 859 (7th Cir. 1989).

[30] *Id.* at 866-70.

-11-

this Court should save it from the consequences of Mark Nordyke's conscious decisions as principal of the 2007 debtor, made with the apparent advice of the debtor's counsel, to convey NV's assets to Benton in a last-ditch effort to "save" them. Stranger still, the debtor alleges as a ground for this proposition that Nordyke, Lazzo, and Benton acted to document and execute these transactions and to conceal them from the creditors and the court in the 2007 case. In short, NV relies on its own managing member's chicanery as a basis for rescinding and subordinating Benton's claims and reversing the conveyances. This is a far cry from the *Jartran* fact pattern where a reorganized business fails, throws in the towel, and seeks an orderly liquidation via a further chapter 11 plan. In that setting, no direct attack is leveled at the previously-confirmed plan; here, NV affirmatively seeks through its adversary proceeding to avoid the very transaction that underpinned the first plan.

After the initial arguments on these motions, NV retreated from its original position that the sequence of events leading up to the confirmation of the prior plan represented the sort of extraordinary, unanticipated, and unforeseeable conditions that would warrant permitting a reorganized debtor to "re-reorganize" under chapter 11. As managing member of NV as well as HGMJ, Mark Nordyke was at the center of the secret agreements. He executed them on behalf of HGMJ. In the state court petitions he filed before NV filed this case, Nordyke claimed that he (instead of NV or HGMJ) was Benton's counter-party and that he personally owned the properties that form the basis of the agreements and are the targets of NV's complaint. The Court may assume that what was filed in NV's behalf in the prior case was filed with his knowledge and consent, although the Court notes that both the plan and the disclosure statement were filed without his signature as the debtor's managing member. Because Nordyke and NV actually saw and participated in the "unforeseeable" events upon which they now rely, they cannot rely on the

-12-

Case 10-13332    Doc# 153    Filed 03/02/11    Page 12 of 14

"extraordinary circumstances" exception to sustain the 2010 case.

NV and Nordyke have captured the Court's attention by highlighting some highly questionable activity during the 2007 case. To begin with, the execution of the Escrow Agreement by non-debtor party HGMJ, controlled by Nordyke, combined with its non-disclosure, is suspicious, to say the least. The Escrow Agreement and the Addendum each delegated duties to NV even though NV was not party to them. The Court concludes that Nordyke intended NV to be bound by these agreements. In any event, NV conveyed estate assets to Benton without seeking court approval or without disclosing to the Court and the creditors what exactly was afoot. Also curious are the undisclosed provisions of these agreements that provided for Benton to underwrite the debtor's attorneys' fees and provided for debtor's counsel to act as an escrowee with duties to turn over the deeds to Benton if certain conditions were met. Failing to disclose those connections would call into serious question counsel's eligibility to represent the debtor after the Escrow Agreement was signed and to be compensated. Benton may not be blameless in these matters, either. Certainly its bankruptcy counsel in the 2007 case should have been aware of the implications of Benton's being involved in a concealed transaction with a chapter 11 debtor.

The Court has concluded that there is cause to dismiss this case as a serial filing not made in good faith. Once cause is found, § 1112(b) requires that the Court dismiss the case or convert it chapter 7, whichever may be in the best interest of the creditors. The Court has wide discretion in determining whether to dismiss or convert.[31] NV and Nordyke are distinctly unqualified to rescind and avoid transactions that Mark Nordyke may have directed. A trustee would be much better-

---

[31] *Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir. 1989)(Court has broad discretion to dismiss a chapter 11 case or convert it to chapter 7 where cause is shown).

Case 10-13332   Doc# 153   Filed 03/02/11   Page 13 of 14

situated to cast a "jaundiced eye and scowling mien" on these affairs than is Nordyke.[32] Had this Court the power to appoint a chapter 11 trustee *sua sponte*, it would do so.[33] Having only the choices of conversion or dismissal at this point, the Court concludes that the best interests of the creditors would be served by converting this case to one of liquidation under chapter 7 so that a trustee may marshal the remaining estate assets and independently evaluate the adversary proceeding. The above-described conduct in the 2007 case may also warrant administrative review by the case trustee, the United States Trustee, or other interested creditors or parties in interest.

In summary, the Court finds that cause exists to dismiss or convert this case as not being brought in good faith and that the best interests of the creditors and the estate will be better served by converting the case to chapter 7. The following is so ORDERED--

Benton's Motion to Dismiss is GRANTED, but the case is CONVERTED to chapter 7, the United States Trustee being directed to name a trustee forthwith; and

Benton's Motion for Stay relief motion is DENIED WITHOUT PREJUDICE to afford the trustee an opportunity to review the debtor's assets and liabilities.

# # #

---

[32] *See In re Interwest Business Equip., Inc.*, 23 F.3d 311, 316 (10th Cir. 1994), *citing In re McKinney Ranch Assoc.,* 62 B.R. 249, 254 (Bankr. C.D. Cal. 1986) (relating to the appointment of estate professionals).

[33] Section 1104 provides that a trustee may be appointed for cause where grounds exist to convert or dismiss the case, but only after notice and a hearing. § 1104(a)(3). No such motion is pending at this time.

-14-